# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

LARKIN L. DERKS,

      Plaintiff,

v.                                    Case No.  3:20-cv-289-BJD-PDB

CENTURION MEDICAL, et al.,

      Defendants.

_____

# **ORDER**

## I. **Status**

Plaintiff, Larkin L. Derks, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action on March 23, 2020, by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. He is proceeding on an Amended Complaint (Docs. 7 and 7-1), filed on July 23, 2020.[1] One Defendant remains – Dr. Alexis Figueroa.[2] See Doc. 36. The only claim before the Court is Plaintiff's claim that Figueroa violated his Eighth

---

[1] Plaintiff's claims and allegations are set out in Doc. 7-1, which Plaintiff has filed as an exhibit to Doc. 7. As such, Docs. 7 and 7-1 are collectively called the Amended Complaint, and the Court will cite each respective Doc. when necessary.

[2] The Court dismissed with prejudice all claims against Defendants Bassa, Cruz, and Centurion. Doc. 36 at 45.

Amendment rights by failing to provide adequate medical care following a surgical procedure. He seeks injunctive relief and monetary damages.[3]

Before the Court is Defendant Figueroa's Motion for Summary Judgment (Doc. 44), with exhibits (Docs. 44-1 through 44-3). Plaintiff responded (Docs. 47, 47-1, 48, 49); Figueroa replied (Doc. 52); and Plaintiff filed a brief in opposition to Figueroa's reply (Doc. 53). Also before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 59), with exhibits (Docs. 59-1 through 59-3, 60); and Figueroa's response to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 63). These Motions are ripe for review.

## II. <u>Plaintiff's Amended Complaint</u>[4]

In his Amended Complaint, Plaintiff alleges that in 2008, before his incarceration, he was in a severe automobile accident resulting in injuries to his shoulders and back.[5] Doc. 7-1 at 6, 7. He asserts that following the accident, he was treated by orthopedic specialists who recommended surgery. <u>Id.</u> He states he was waiting approval for funds to have the surgery when he entered

---

[3] The Court dismissed with prejudice Plaintiff's claims against Figueroa under the Americans with Disabilities Act, Rehabilitation Act, Fourteenth Amendment, and Chapters 458 and 456, Florida Statutes. <u>See</u> Doc. 36 at 45.

[4] The Court only summarizes the relevant allegations pertaining to Figueroa.

[5] According to the FDOC's website, Plaintiff entered FDOC custody on November 4, 2009.

prison. Id. Plaintiff admits that before filing this action, he filed two other actions "concerning the same injuries with different facts and respondents." See id. at 9-10; see also Derks v. Corizon, No. 5:15-cv-51-MW-GRJ (N.D. Fla.); Derks v. Centurion, No. 6:18-cv-451-PGB-EJK (M.D. Fla.).[6] Here, Plaintiff sues Figueroa for denial of medical care from August 31, 2018, to the present, while housed at Suwannee Correctional Institution (Suwannee C.I.). Doc. 7 at 5.

Although not a picture of clarity, a review of the Amended Complaint's exhibits appears to show that on August 31, 2018, Plaintiff underwent left shoulder surgery at Reception and Medical Center (R.M.C.) to repair a "[m]assive tear of rotator cuff with significant impingement, changes of acromioclavicular joint region, tear of the long head of the biceps and some tearing of the labrum." Doc. 7-1 at 11. Plaintiff alleges that following that surgery, he was transferred to Suwannee C.I. where Figueroa oversees inmates' medical care. Id. at 6-7. According to Plaintiff, upon his transfer, Figueroa refused to follow specialist surgeons' instructions when treating

---

[6] In Derks v. Corizon, LLC, et al., No. 5:15-cv-51-MW-GRJ (N.D. Fla.), Plaintiff sued medical providers at Northwest Florida Reception Center for failing to provide recommended specialized neurological and orthopedic care for chronic shoulder, back, and neck injuries stemming from the auto accident that occurred before his incarceration. That case settled. In Derks v. Centurion, LLC, et al., No. 6:18-cv-451-PGB-EJK, Plaintiff sued medical providers at Central Florida Reception Center for failing to provide adequate medical care for the same injuries alleged in No. 5:15-cv-51-MW-GRJ and this action. That case was dismissed. Id.

3

Plaintiff for his post-surgical trauma. Id. at 7. He alleges that specialist doctors at R.M.C. had issued medical passes, but when Plaintiff arrived at Suwannee C.I., Figueroa refused to acknowledge or continue the medical passes, "with no examination, no consult, stating these medically needy passes were not permitted at this institution according to policy . . . ." Id. Plaintiff also asserts that Figueroa believed Plaintiff had a fractured elbow and recommended that he receive an x-ray, but Figueroa failed to conduct the x-ray or follow-up with the elbow injury despite Plaintiff's sick-call requests. Id. Plaintiff also states that Figueroa has not seen or treated Plaintiff for injuries to his right shoulder or serious back injury despite orthopedic and neurological specialist recommendations. Id.

Plaintiff alleges Figueroa's failure to treat him amounts to deliberate indifference to his serious medical needs in violation of his rights under the Eighth Amendment. Doc. 7 at 3. Plaintiff asserts that because of Figueroa's prolonged denial of medical care, Plaintiff will need more painful and extensive procedures to correct the post-surgical damage and now suffers from increased pain and permanent disability. Id. at 5. He contends that he is confined to a wheelchair and requires an assistant to help him because basic tasks are increasingly painful. Id. Plaintiff sues Figueroa in his individual and official capacities. Id. at 3.

### III. <u>Standard of Review for Summary Judgment</u>

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Est. of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of proving to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with

affidavits or other similar material <u>negating</u> the opponent's claim,' <u>Celotex</u> <u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), in order to discharge this initial responsibility." <u>Gonzalez v. Lee Cnty. Hous. Auth.</u>, 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may show "that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u>

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. <u>Eighth Amendment</u>

"To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct."

<u>Oliver v. Fuhrman</u>, 739 F. App'x 968, 969 (11th Cir. 2018) (citing <u>Chandler v.</u>

<u>Crosby</u>, 379 F.3d 1278, 1289 (11th Cir. 2004)).[7] The Eleventh Circuit has

explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. <u>Id.</u> The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. <u>Id.</u> The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. <u>Id.</u>
>
> Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. <u>Id.</u> This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than mere negligence. <u>Farrow v. West</u>, 320 F.3d 1235, 1245 (11th Cir. 2003).

<u>Id.</u> at 969-70. "To be cruel and unusual punishment, conduct that does not

purport to be punishment at all must involve more than ordinary lack of due

care for the prisoner's interests or safety." <u>Whitley v. Albers</u>, 475 U.S. 312, 319

(1986).

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" <u>Melton v. Abston</u>, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976)). The Eleventh Circuit has explained that

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1306-07 (11th Cir.2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." <u>Townsend v. Jefferson Cnty.</u>, 601 F.3d 1152, 1158 (11th Cir.2010) (alteration in original). The defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and then actually draw that inference. <u>Farrow v. West</u>, 320 F.3d 1235, 1245 (11th Cir.2003) (quotation omitted).

<u>Easley v. Dep't of Corr.</u>, 590 F. App'x 860, 868 (11th Cir. 2014); <u>see also</u> <u>Patel v. Lanier Cnty. Ga.</u>, 969 F.3d 1173, 1188-89 & n.10 (11th Cir. 2020) (recognizing "a tension within [Eleventh Circuit] precedent regarding the minimum standard for culpability under the deliberate-indifference standard," as some cases have used "more than <u>gross</u> negligence" while others have used "more than <u>mere</u> negligence"; finding, however, that it may be "a distinction without a difference" because "no matter how serious the negligence, conduct

that can't fairly be characterized as <u>reckless</u> won't meet the Supreme Court's standard" (citations omitted)).

"For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" <u>Nimmons v. Aviles</u>, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir.1991)); <u>see also</u> <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem).

The law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. <u>Daniels v. Williams</u>, 474 U.S. 327, 330-31 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 348 (1986) ("As we held in <u>Daniels</u>, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). As such, a complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted). Moreover, the Eleventh Circuit has stated that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to

subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

## V. Figueroa's Motion for Summary Judgment

In his Motion, Figueroa argues that he was not deliberately indifferent to Plaintiff's serious medical needs. Doc. 44 at 2. He asserts he treated Plaintiff's shoulders and back several times; he continued to issue medical passes first prescribed by R.M.C.; and "there are no medical records prepared by any providers at any point diagnosing a left elbow fracture or recommendation for an x-ray to the left elbow." Id.  Figueroa argues he is entitled to summary judgment on Plaintiff's Eighth Amendment claim. Id. In support of this argument, Figueroa provides Plaintiff's medical records from June 2018 to September 2020 (Doc. 44-1); Plaintiff's December 2018 transfer order (Doc. 44-2); and several of Plaintiff's inmate grievances (Doc. 44-3). The Court chronologically summarizes the evidence Figueroa filed.

### a.    Medical Care at R.M.C.[8]

In June 2018, Plaintiff was transferred from Central Florida Reception Center to R.M.C. Doc. 44-1 at 90. Once at R.M.C., medical evaluated Plaintiff, during which Plaintiff advised medical that he suffered a left shoulder rotator cuff tear ten years prior, his scheduled surgical repair never occurred because he went to prison before the operation, and he suffers from weakness and loss of mobility. Id. at 53. The physician recommended Plaintiff undergo an M.R.I. for his left shoulder and issued a medical pass for a button-up shirt. Id.

On July 10, 2018, medical conducted an exam, during which Plaintiff complained of left shoulder pain and requested renewal of his Ibuprofen prescription. Id. at 87. Medical provided Plaintiff with 400mg Ibuprofen and noted he had a pending appointment with his primary care provider.[9] Id. at 88. A few days later, Plaintiff underwent an M.R.I. of his left shoulder, which showed a "large, full-thickness partial-width rotator cuff tear." Id. at 94.

On July 27, 2018, orthopedic physician Dr. T. Winters evaluated Plaintiff, reviewed the M.R.I. results, and noted Plaintiff had pain and weakness in his right and left shoulders and that his left shoulder ailments

---

[8] The Court dismissed with prejudice all Defendants and claims related to the medical care Plaintiff received at R.M.C., so the Court only summarizes relevant facts about Plaintiff's medical treatment at R.M.C. for context.

[9] Plaintiff also underwent a separate exam for ongoing acid reflux. Doc. 44-1 at 85-86.

11

were worse than his right shoulder. Id. at 51. Winters also reported that M.R.I.s of both Plaintiff's right and left shoulders were conducted in 2008, which presented small rotator cuff tears in both shoulders. Id. Winters and Plaintiff discussed surgery and Plaintiff conveyed his desire that doctors attempt a surgical repair of the large tear in his left rotator cuff. Id.

On August 31, 2018, Winters conducted surgery on Plaintiff's left shoulder. Id. at 5. During the operation, Winters found a massive tear to the left rotator cuff, a complete tear of the long head of the bicep, tearing of the labrum, and significant impingement and changes of the acromioclavicular joint area. Id. According to the operative report, doctors successfully got "the rotator cuff mobilized after repairing it with excellent repair." Id. According to Winters's post-surgery instructions, Plaintiff was prescribed pain medication and was issued medical passes for low bunk, no pushing/pulling/lifting over eighteen pounds, wheelchair, and left arm sling. Id. at 7-8. Winters also ordered that Plaintiff undergo an orthopedic follow-up in two weeks. Id. at 50.

On September 7, 2018, Plaintiff was discharged with a diagnosis of, among other things, rotator cuff surgery repair, low back pain at level of L4-5, and multilevel disc degenerative disease. Id. at 57. Plaintiff was instructed to undergo suture removal when skin heals, wear left arm sling for eight weeks, wear a button shirt for eight weeks, not raise shoulder over thirty degrees, use wheelchair for ambulation, and front cuff for eight weeks. Id. at 57-58.

On September 14, 2018, Plaintiff had his two-week follow-up appointment with the orthopedic physician who noted Plaintiff's passive range of motion was good, removed his sutures, and recommended a single bunk pass and a four-week follow-up. Id. at 49, 84. The doctor also conducted an x-ray that revealed mild degenerative joint disease in the left shoulder. Id. at 93. On September 17, 2018, Plaintiff underwent another follow-up and was issued a single bunk medical pass for four weeks, prescribed Meloxicam 15mg for thirty days, and asked to return in three weeks for possible physical therapy. Id. at 83. Three days later, medical evaluated Plaintiff and recommended skilled physical therapy two times per week for six weeks. Id. at 47-48.

On October 10, 2018, the disabled inmate committee evaluated Plaintiff and listed his medical passes as permanent wheelchair and low bunk. Id. at 16. That same day, radiologist Elliott Wagner took another x-ray of Plaintiff's left shoulder, which again showed mild degenerative joint disease but otherwise no fracture or dislocation. Id. at 96. Plaintiff began physical therapy on October 15, 2018, and three days later, upon his request, Plaintiff signed a refusal form declining all physical therapy services "due to constant pain at a level 8 or higher." Id. at 81, 59. On October 22, 2018, Plaintiff submitted a sick-call request complaining about severe shoulder pain. Id. at 80. In response, medical examined Plaintiff and noted mild swelling and pain upon palpitation and movement of the left shoulder. Id. at 78. Medical provided him with a

sixteen-pack of 400mg Ibuprofen and scheduled a follow-up x-ray. Id. at 78-79. On October 31, 2018, medical examined Plaintiff and instructed him to do daily left shoulder exercises. Id. at 77. On or about November 20, 2018, Plaintiff filed a formal grievance complaining that he received inappropriate postoperative care. Id. at 76. The grievance coordinator denied the grievance after conducting a records review that confirmed Plaintiff refused all physical therapy encounters. Id.

### b.    *Medical Care at Suwannee C.I.*

On December 5, 2018, Plaintiff was transferred from R.M.C. to Suwannee C.I. Doc. 44-2. The next day, medical received Plaintiff's sick-call request stating he was experiencing severe pain and "post-surgical trauma from shoulder surgery," as well as "injuries in RT shoulder and back hurting." Doc. 44-1 at 75. Plaintiff requested medical pass and medication renewal. Id. On December 11, 2018, nurse S. Kemp conducted a sick-call exam and noted that Plaintiff "needs renewal of passes – button down shirt pass . . . impaired [inmate] asst., [wheelchair], wheelchair cushion, . . . [and] single bunk." Id. at 74. Kemp noted "chart to MD for review." Id. at 74.

On January 22, 2019, Figueroa wrote on Plaintiff's chronological record of health care that "passes renewed according to policy." Id. That same day, disabled inmate committee member D. Parrish filled out Plaintiff's disabled inmate management and service plan, which listed Plaintiff as having a

14

medical pass for wheelchair. Id. at 17. Plaintiff was present when D. Parrish conducted the evaluation, Plaintiff specified on the form that he was not making any A.D.A. requests, and Plaintiff signed the form upon completion. Id.

On February 11, 2019, Figueroa examined Plaintiff, during which Plaintiff complained of "joint pain" and "muscle tenderness." Id. at 37. Figueroa found Plaintiff had mild left shoulder atrophy and mild degenerative joint disease of the left shoulder. Id. Figueroa ordered "muscle rub," renewed low bunk medical pass, and noted "passes were renewed on Jan. 2019." Id. Figueroa also prescribed a thirty-day supply of 600mg Ibuprofen. Id. at 41.

On February 20, 2019, Plaintiff submitted a sick-call request stating, "I would like to know what happened to the passes Dr. Figueroa said he was issuing one 2-10-19 or 2-11-19." Id. at 73. Seven days later, nurse Kemp conducted a sick-call evaluation, documenting "per MD note date 1/22/19 all passes [ ] renewed per policy. No pass for button down shirt issued." Id. at 72. Kemp also noted that Plaintiff "voiced understanding after stating he would add MD to current lawsuit." Id.

On March 1, 2019, Figueroa wrote on Plaintiff's chronological record of health care that "passes [ ] renew[ed]." Id. at 72. Four days later, administrative assistant R. Corbin noted Plaintiff's informal grievance about

"passes [and] analgesic balm" was denied because "balm can be [requested] in [sick-call] [and] passes written per policy." Id.

On April 17, 2019, Plaintiff submitted a grievance requesting a new wheelchair. Doc. 44-3 at 1. Medical provided Plaintiff with a new wheelchair on April 24, 2019, and thus his grievance was returned on April 24, 2019. Id. On May 9, 2019, Plaintiff submitted a grievance stating, among other things, that since his transfer to Suwannee C.I., Figueroa has only examined him once; Figueroa never issued Plaintiff medical passes corresponding with the passes issued at R.M.C.; and that Dr. Winters was not contacted about post-surgical trauma before his transfer to Suwannee C.I. Id. at 3. Dr. F. Cruz denied the grievance, explaining that on "1/22/19 the MD issued passes for Low Bunk, Restricted Activity (No push/pull > 20lbs & no stand > 20 min.) and Wheel Chair w/ cushion." Id. at 2. Cruz asserted "[i]t is a clinical decision, if an inmate, will be issued a pass for medically necessary items." Id. A few days later, Plaintiff submitted a grievance complaining about a change in the dosage of his blood pressure medication without receiving a physician consultation. Id. at 5. Cruz denied the grievance, advising Plaintiff that his dosage was changed during his visit to the chronic illness clinic on February 11, 2019. Id. at 4. According to Cruz, however, Plaintiff did not deliver his refill slip for the new dosage until May, which explains Plaintiff's delayed recognition of the dosage

increase. Id. Cruz then stated "inmates do not have the authority to dictate which medications or how a medication is prescribed by the clinician." Id.

On July 18, 2019, Plaintiff submitted a sick-call request asking for a medication renewal for Ibuprofen and muscle rub. Doc. 44-1 at 70. A few days later, physician assistant L. Henderson prescribed Plaintiff a thirty-day supply of 600mg Ibuprofen. Id. at 69. On July 23, 2019, nurse B. Cannon completed a disabled inmate management and service plan for Plaintiff. Id. at 15. Cannon listed Plaintiff's passes as wheelchair, low bunk, no push/pull more than twenty pounds, and no standing more than twenty minutes Id. Plaintiff, refused to participate in Cannon's assessment and did not sign the plan. Id.

On August 4, 2019, Plaintiff submitted an accommodation request to exchange his combination lock for a key lock because his left-arm injury made it difficult to open his combination lock. Id. at 21. Nurse A.K. Shaw evaluated the request and advised officials that Plaintiff suffers from mobility impairment and would benefit from device accommodation. Id. at 22. Based on that recommendation, officials approved Plaintiff's request. Id.

On August 19, 2019, Figueroa again examined Plaintiff, during which Plaintiff complained of right shoulder pain. Id. at 36. Figueroa observed that Plaintiff's left elbow was bruised and yellowish and noted that he would review Plaintiff's previous left shoulder x-ray. Id. Figueroa then ordered a chest x-ray, prescribed 15mg Mobic, and said that he "will be following [right] shoulder

complaint." Id. That same day, Figueroa authorized Plaintiff's one-year medical passes for low bunk; wheelchair pusher; reduced activity – no prolonged standing, no push/pull/lift more than twenty pounds; and attendant. Id. at 43. And he authorized a permanent wheelchair pass. Id. Eight days later, radiologist Steven Picerne conducted Plaintiff's chest x-ray and found "no acute pulmonary process." Id. at 92.

On September 3, 2019, Plaintiff submitted a sick-call request complaining of pain and stating that two weeks prior, Figueroa prescribed a new medication and ordered x-rays for Plaintiff's "left elbow believed to be fractured and [right] shoulder," but he has not received the medication or x-rays. Id. at 68. According to Plaintiff, "all [he] was given [were] passes for wheelchair, impaired asst., etc." Id. Three days later, nurse S. Hancock examined Plaintiff and advised him that Figueroa ordered an x-ray of only Plaintiff's chest, prescribed only one medication – Mobic, and documented that he would be following Plaintiff's right shoulder complaint. Id. at 67. Hancock advised Plaintiff to "watch for call-out," and noted that Plaintiff understood. Id. On September 9, 2019, Plaintiff submitted an accommodation request stating he has a medical pass for a mobility assistant, but no one has been assigned. Id. at 42. That same day, officials approved his request for an assistant and explained one would be provided when the next group of inmates finish their mobility assistant training. Id.

On October 3, 2019, nurse B. Cannon completed Plaintiff's quarterly disabled inmate management and service plan. Id. at 14. Cannon reported that Plaintiff did not show up for the meeting nor did he participate in the plan or sign a refusal. Id. B. Cannon listed Plaintiff's medical passes as "wheelchair, attendant, pusher, low bunk, no ppl >20lbs, no stand >20 min." Id.

On November 18, 2019, Plaintiff submitted an urgent sick-call request complaining that "spinal impingement getting worse, to point of severe pain and loss of feeling."[10] Id. at 64. According to Plaintiff, the injury was "ongoing since . . . fall 2012 but sometimes better sometimes worse, now is much worse." Id. Two days later, nurse S. Hancock conducted a back pain protocol exam and recorded that Plaintiff was suffering from severe back pain, prescribed 200mg Ibuprofen with instructions to take the medication two-to-three times a day, advised him to limit activity until discomfort improves, and sent his chart to the doctor to change his pain medication from Mobic to "something else." Id. at 61-62. Figueroa reviewed the chart on November 25, 2019, and wrote that Plaintiff's chronic back pain was addressed in the clinic every six months and that Plaintiff "by protocol and policy knows the medication available as well as passes." Id. at 60. Figueroa also noted Plaintiff has Ibuprofen available in his dorm and Naproxen would be ordered. Id.

---

[10] Plaintiff also complained of "rectal leakage and severe acid reflux." Doc. 44-1 at 64.

19

On January 15, 2020, Plaintiff participated in his quarterly disabled inmate management service plan conducted by nurse B. Cannon. Id. at 13. Cannon listed Plaintiff's medical passes as low bunk; no pushing, pulling, lifting more than twenty pounds; no standing more than twenty minutes; wheelchair; pusher; and assistant. Id. On January 24, 2020, Plaintiff submitted a sick-call request about needing pass renewal for "wheelchair/cushion/int. ass't/low bunk, etc." Id. at 32. Plaintiff also complained about ongoing gastrointestinal issues and stated he did not have problems with a low residue diet. Id. Medical conducted a sick-call exam and recorded that during the exam, Plaintiff requested a low residue diet because of diarrhea. Id. at 33. Medical charted the request for a doctor review, and Figueroa responded by advising staff to discuss the diet policy with Plaintiff, so he understands that diet passes must be approved by the Regional Medical Director under special conditions. Id.

On February 10, 2020, Figueroa examined Plaintiff, during which he complained of gastrointestinal issues and advised Figueroa he managed those issues when he was on a low residue diet. Id. at 35. Figueroa found Plaintiff had limited range of motion in both his left and right shoulders, pain in his left shoulder, and chronic back pain. Id. Figueroa assessed Plaintiff for left shoulder degenerative joint disease and renewed Plaintiff's medical passes for a wheelchair and cushion. Id. Figueroa planned for Plaintiff to undergo a right

shoulder x-ray and continue his medication regimen but noted Plaintiff did not qualify for the requested low residue diet pass. Id. Four days later, Plaintiff submitted a sick-call request stating Figueroa "said [Plaintiff] would receive a pass for either diet [ ] to fix problem or pull-up pass . . . but [he] ha[s] not received []either." Id. at 30. Before he was seen for his sick-call request, radiologist Santiago Jimenez conducted Plaintiff's right shoulder x-ray, which showed chronic rotator cuff arthropathy changes and no acute fracture. Id. at 55. On February 20, 2020, nurse B. Bodley conducted a sick-call exam of Plaintiff, during which Bodley advised Plaintiff he did not meet diet pass requirements. Id. at 29. Plaintiff submitted a grievance asserting that medical advised he would receive either a low-fat diet pass or a pass for pull-ups for "issue of diarrhetic leakage," but Plaintiff had not received either. Id. at 23. Officials denied the grievance, advising that medical examined Plaintiff on February 10, 2020, and February 20, 2020, and determined Plaintiff did not meet the requirements for a diet pass and that "[t]here was no mention of pull ups by either clinician." Id.

On April 25, 2020, Plaintiff submitted a sick-call request for renewal of 600mg Ibuprofen and complained of "loose bowls causing leakage," which he claimed was fixed with a diet pass that he no longer has. Id. at 28. Three days later, Figueroa recorded in Plaintiff's chronological record of health care that Plaintiff has no history of fecal incontinence. Id. at 27. Figueroa also

21

documented that he discussed Plaintiff's case with the Regional Medical Director and there was no diagnosis to justify the use of pull-ups or diapers. Id.

On July 13, 2020, Figueroa examined Plaintiff, during which Plaintiff complained of "problems with [his] back and shoulder." Id. at 34. Figueroa renewed all Plaintiff's medications, including muscle rub and 15mg Mobic, and ordered x-rays of Plaintiff's shoulders and back. Id. at 34. Figueroa also issued one-year medical passes for low/bottom bunk; restricted activity – no prolonged standing more than 20 minutes and no pushing, pulling or lifting more than twenty pounds; wheelchair; cushion; button-up shirt; and wheelchair pusher/assistant. Id. at 44. On July 21, 2020, Dr. Mark W. Cooper conducted an x-ray on Plaintiff's back and found "L4-S1 spondylytic disease and spinal stenosis" and "negative sacrum and coccyx." Id. at 54.

On September 24, 2020, Figueroa examined Plaintiff who requested a button-up shirt pass. Id. at 26. Figueroa noted he would "get with A.D.A. for assistance." Id. Figueroa also documented that Plaintiff's case was reviewed and referred to the Regional Medical Director about Plaintiff's shoulder concern, and recorded that Plaintiff's prior shoulder surgery resulted in a "poor outcome," so another surgery was not "a wise option" and Plaintiff recognized this medical advice. Id. at 25. Figueroa instead concluded that a home exercise plan and assistance with daily living activities was "more reasonable" for

22

Plaintiff, and Figueroa did not recommend an orthopedic consult. <u>Id.</u> Figueroa also reissued Plaintiff's medical passes for button-up shirt, wheelchair, cushion, pusher or assistant, and no prolonged standing. <u>Id.</u> at 44. And he prescribed muscle rub. <u>Id.</u> at 38.

### VI. <u>Plaintiff's Response</u>

In response, Plaintiff largely restates the allegations in his Amended Complaint. Doc. 47. He asserts he was transferred to Suwannee C.I. "after declaration of post[-]surgical trauma after left shoulder surgery," and that the trauma "was declared as a result of forced physical therapy in disregard to orthopedic doctors treatment plan." <u>Id.</u> at 2. According to Plaintiff, Figueroa waited over a month to examine Plaintiff after his transfer, and during Figueroa's exam, Plaintiff gave Figueroa copies of his medical records outlining his need for medical care. <u>Id.</u> Plaintiff argues that despite his review of Plaintiff's medical history, Figueroa failed to properly treat his left shoulder, failed to reissue medical passes, and failed to conduct a previously ordered left elbow x-ray. <u>Id.</u> According to Plaintiff, orthopedic specialists recommended Plaintiff undergo right shoulder surgery and other specialists recommended Plaintiff receive a neurological consult for his back injury, but Figueroa failed to follow those recommendations and his "decision to take an easier and less efficacious course of treatment [ ] constitutes deliberate indifference." <u>Id.</u> at 7. He asserts that because of Figueroa's conduct, Plaintiff's right shoulder and

back injuries have progressively deteriorated, resulting in declined right-arm mobility and severe pain. Id. at 4-5. As such, he asks the Court to deny Figueroa's Motion for Summary Judgment. In support of his position, Plaintiff provides several medical records and grievances (Doc. 47-1); a Declaration (Doc. 48); and a Statement of Disputed Factual Issues (Doc. 49).

A chronological review of Plaintiff's exhibits shows that on August 1, 2008, the Florida Institute for Advanced Diagnostic Imaging conducted an M.R.I on Plaintiff's right and left shoulders. Doc. 47-1 at 12-13. The M.R.I.s revealed full thickness tears of each shoulder's rotator cuff and degenerative joint disease in each shoulder. Doc. 47-1 at 12-14. On August 26, 2008, medical personnel reviewed the M.R.I. results with Plaintiff and discussed conducting a "sh[oulder] scope" to fix Plaintiff's left shoulder injury and administering injections for Plaintiff's right shoulder injury. Id. at 1. The doctor wrote, "for now – [Plaintiff] rec. injecti[ons] [in] both shoulders to help" and Plaintiff "agree[d] to ice/rest." Id. at 2. That same day, doctors issued a surgery schedule slip scheduling a left shoulder scope surgery for rotator cuff repair. Id. at 8.

The next chronological medical record Plaintiff offers shows that on November 15, 2010, Dr. Nalini Anadjiwala, a physician at R.M.C., ordered that Plaintiff undergo "flex/extend c-spine x[-]rays for neurosurgeon." Id. at 10. On November 19, 2010, radiologist E. E. Franco conducted Plaintiff's spine x-ray, which revealed "evidence of instability at the C4-5 level with flexion and

24

extension maneuvers. The degree of anterolisthesis is corrected with extension maneuver." Id. at 10. The last chronological medical record Plaintiff provides is a September 23, 2013, consult report from an exam by Dr. Carlos Gama, a neurologist at R.M.C. Id. at 11. Under Plaintiff's medical history, Gama noted a history of low back pain and mentioned a prior M.R.I. of Plaintiff's spine showed abnormal disc bulges at L4-5, L2-3, and L3-4. Id. Gama recommended "neurosurgical consult[;] Robaxin 500mg [ ] [;] [and] RTC as needed." Id. at 11.

Plaintiff provides a copy of the May 9, 2019, grievance about medical pass renewals, which the Court previously discussed. Id. at 16. And he filed the May 22, 2019, grievance appeal, in which Plaintiff again complained that he came to Suwannee C.I. with specialist-issued medical passes and Figueroa verbally advised him on January 1, 2019, that he would receive passes for a button-up shirt and a single bunk, but Plaintiff was told at sick-call that Suwannee C.I. "does not honor those types of passes." Id. at 18. Plaintiff attaches the Secretary's denial of that appeal. Id. at 17.

In his Declaration, Plaintiff states the following, in relevant part:

> On December 05, 2018, Plaintiff was transferred to Suwannee C.I. Annex, where during intake medical person[n]el were informed of post-surgical trauma relating to surgery on left shoulder at R.M.C. . . . .
>
> On December 05, 2018, Medical person[n]el were informed of right shoulder rotator cu[ff] injury and prescription scheduling and recommending surgery on right shoulder by orthopedic specialists.

25

On December 05, 2018, During intake, medical person[n]el were informed of back injury and recommendation by neurologist to neurosurgeon for treatment by doctor at R.M.C. [ ].

On January 22, 2019, Dr. Figueroa issued medical passes while informing Plaintiff that medical passes recommended by orthopedic specialist Dr. Winters would not be given for button-up shirt and single bunk pass as they were not given at this institution according to policy.

On January 22, 2019, Dr. Figueroa was asked by Plaintiff as to Plaintiff's need for orthopedic consult and subsequent need for surgery on right shoulder as prescribed by orthopedic specialists of Palm Harbor, Inc. Plaintiff was told by Dr. Figueroa that he had not reviewed Plaintiff's medical file but would do so. Dr. Figueroa was also informed of Plaintiff's back injury and recommendation by Dr. Catrero, a neurologic specialist at Lake Butler Medical Center and his recommendation for consult by neurosurgeon for treatment.

On February 11, 2019, Plaintiff was seen in chronic illness clinic [ ] at which time Plaintiff gave Dr. Figueroa copies of his medical file detailing Plaintiff's medical needs, such as, copy of M.R.I. scans of Plaintiff's left and right rotator cu[ff] injuries, prescription and treatment plans for surgery on left shoulder rotator cu[ff] by orthopedic specialists, as well as the neurologist consult by doctor at R.M.C. Lake Butler recommending Plaintiff to neurosurgeon for prescription and treatment of back injury along with M.R.I. scans of spinal column.

Plaintiff believes that Dr. Figueroa's continued deliberate indifference to Plaintiff's serious medical need for surgery on right shoulder as recommended by orthopedic specialist is causing further extensive

damage as has been seen in left shoulder surgery, causing unnecessary pain and suffering.

Plaintiff whose medical passes from orthopedic doctor had expired due to refusal of Dr. Bassa at R.M.C. to allow follow-up consult, explained to Dr. Figueroa the need for passes and the reason passes were expired [but Figueroa] refused to write passes for button-up shirt and single bunk, stating those passes were not allowed according to policy.

Two years after Dr. Figueroa's refusal to follow recommendation of orthopedic doctor concerning button-up shirt for mobility issues, Dr. Figueroa issued button-up shirt pass one month after service of § 1983 complaint [o]n his person.

Plaintiff has repeatedly declared the need for medical care pr[e]scribed by specialist doctors and the fear of permanent disability if not treated, as was seen in left shoulder.

Dr. Figueroa stated to Plaintiff that he would put the Plaintiff in for x-ray of left elbow believed to be fractured due to Plaintiff's statement of elbow grinding and pains, but then refused to do so.

Plaintiff went to sick-call to ask why he did not receive x-ray and wrote grievances denoting need for treatment of left elbow fracture to no avail.

To date, Plaintiff has had no x-ray of left elbow.

. . . .

Doc. 48 (paragraph numbering omitted).

# VII. <u>Analysis and Conclusion</u>

Neither party disputes that Plaintiff had a serious medical need. The only question then is whether Figueroa acted deliberately indifferent to that need. Liberally construed, Plaintiff describes four circumstances of Figueroa's alleged deliberate indifference: (1) Figueroa failed to reissue the same medical passes that R.M.C. doctors issued; (2) he failed to follow orthopedic specialist's recommendation for surgery to repair a tear in Plaintiff's right shoulder rotator cuff; (3) he failed to follow neurology specialist's recommendation for neurological treatment of Plaintiff's back injury; and (4) Figueroa never conducted a left elbow x-ray after telling Plaintiff that an x-ray was needed. The Court considers each allegation in turn.

### a.   *Medical passes*

As to the issuance of medical passes, Plaintiff primarily argues that Figueroa's failure to reissue medical passes for button-up shirt and single bunk violated his Eighth Amendment rights. <u>See</u> Doc. 48. But those passes expired before his transfer to Suwannee C.I., and Plaintiff admits in his Declaration that those passes expired because doctors at R.M.C. refused to renew them. Indeed, on September 7, 2018, medical personnel at R.M.C. specifically issued an eight-week button-up shirt pass, which consequently expired on November 2, 2018. On September 17, 2018, R.M.C. issued its four-week single bunk pass, which subsequently expired on October 15, 2018. Thus, Plaintiff had neither a

28

button-up shirt pass nor a single bunk pass in effect at the time of his December 2018 transfer to Suwannee C.I.

Further, after his transfer, Figueroa's decision about which passes to issue were matters of medical judgment that do not rise to the level of deliberate indifference. Estelle, 429 U.S. at 107. In January 2019, Figueroa renewed Plaintiff's medical passes "according to policy." When Plaintiff filed a grievance complaining that Figueroa did not issue all the passes he had at R.M.C., Dr. Cruz clarified that the passes Figueroa issued in January 2019 were for low bunk, restricted activity (no push/pull over twenty pounds and no standing over twenty minutes), wheelchair, and wheelchair cushion. Cruz also advised Plaintiff that "[i]t is a clinical decision, if an inmate, will be issued a pass for medically necessary items." Doc. 44-3 at 2. By August 2019, Figueroa made the clinical decision to issue Plaintiff a permanent wheelchair pass and year-long passes for low bunk; wheelchair pusher; reduced activity – no prolonged standing, no push/pull/lift over twenty pounds; and attendant. Id. at 43. The record shows that Plaintiff still had those medical passes in January 2020, and Figueroa, upon Plaintiff's request, renewed a cushion pass in February 2020.

Although Figueroa did not issue a button-up shirt pass until after Plaintiff initiated this action, Plaintiff has presented no "verifying medical evidence" showing that he suffered any "detrimental effect" as result of the

alleged delay. See Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled on other grounds by Hope v. Pelzer, 536 U.S. 730 (2002) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."). Likewise, Plaintiff has presented no evidence showing he suffered any detrimental effect from Figueroa's decision to not reissue a single bunk medical pass.

Instead, a chronological review of Plaintiff's medical records shows Figueroa was aware of Plaintiff's medical condition and history. When Plaintiff presented medical complaints, Figueroa considered those complaints, examined Plaintiff, and made objective findings about which medical passes to issue. Thus, Figueroa did not act deliberately indifferent when issuing Plaintiff's medical passes.

### b.   *Right shoulder*

As to his contention that Figueroa refused to follow specialist's recommendation for right shoulder surgery, Plaintiff relies on the 2008 M.R.I. he received before his incarceration. See Doc. 47-1 at 13-14. The 2008 M.R.I. revealed a severe full thickness tear in the right rotator cuff, much like the tear discovered in his left shoulder rotator cuff the same day. Id. at 12, 13. After the M.R.I.s, however, doctors scheduled a surgical repair for only the left

shoulder rotator cuff tear and discussed treating Plaintiff's right shoulder with injections as well as ice and rest.

Plaintiff was incarcerated before the left shoulder surgery could take place, and that surgery was not discussed again until ten years later when Plaintiff was housed at R.M.C. Doc. 44-1 at 51. Notably, at R.M.C., orthopedist Dr. Winters examined Plaintiff in 2018 and noted that the 2008 M.R.I.s showed tears in Plaintiff's right and left rotator cuffs, but that Plaintiff complained that his left shoulder was weaker than his right shoulder. Id. According to Dr. Winters's notes, Plaintiff asked doctors to attempt a surgical repair of his left shoulder injury. Id. The document never mentions a surgical repair of his right shoulder.

The evidence also shows that once at Suwannee C.I., Plaintiff only complained to Figueroa about right shoulder pain twice between December 2018 and March 2020, when Plaintiff filed this action. Although Figueroa conducted his first clinical exam of Plaintiff on February 11, 2019, the evidence reveals that Plaintiff complained to Figueroa about right shoulder pain for the first time on August 19, 2019. Doc. 44-1 at 36. On that date, Figueroa noted that Plaintiff's current complaint was right shoulder pain, stated he "will be following [right] shoulder complaint," and prescribed 15mg Mobic. Id. at 36. The second time Figueroa documented an issue with Plaintiff's right shoulder was on February 10, 2020, during an exam to address Plaintiff's continuing

31

request for a low residue diet pass. It was during Figueroa's objective findings that he recorded a limited range of motion in Plaintiff's right shoulder and made the decision to order a right shoulder x-ray. Id. at 35. Then, at Figueroa's request, Plaintiff underwent his right shoulder x-ray eight days later, which showed chronic rotator cuff arthropathy changes and no acute fracture. Id. at 55.

In July 2020, three months after Plaintiff filed this action, he made his third complaint about right shoulder pain to Figueroa. Following that complaint, Figueroa renewed Plaintiff's pain medications, including 15mg Mobic and muscle rub, and ordered that a second x-ray be conducted of both shoulders. In September 2020, Figueroa advised Plaintiff that he discussed Plaintiff's right shoulder concern with the Regional Medical Director and determined that surgery was not a "wise option" for Plaintiff considering the complications Plaintiff experienced following his left shoulder surgery. The record shows Plaintiff acknowledged that medical advice.

In sum, there is no evidence that any doctor, either before Plaintiff's incarceration or during his incarceration, recommended that Plaintiff receive right shoulder surgery. Instead, the record shows that since 2008, doctors and Plaintiff only discussed left shoulder surgery and a more conservative approach to treat his right shoulder injury. The fact that Plaintiff was dissatisfied with Figueroa's conservative approach does not mean he was

subjected to cruel and unusual punishment. At most Plaintiff has shown a disagreement with the course of treatment. Indeed, after the 2018 surgical repair of his left shoulder, Plaintiff refused to participate in the recommended physical therapy, and he argues that he now suffers from "permanent disability" in his left shoulder. Plaintiff contends that Figueroa's failure to provide right shoulder surgery will result in the same outcome. But Plaintiff's logic is flawed. Plaintiff cannot rely on his left shoulder post-surgical complications to show Figueroa disregarded a risk of serious harm by failing to conduct the same surgery on Plaintiff's right shoulder. It is apparent that Figueroa did not want to subject Plaintiff to another invasive surgical procedure that could potentially result in the same poor outcome. Rather, Figueroa continually monitored Plaintiff's right shoulder pain and Plaintiff has not shown that his course of treatment amounted to deliberate indifference. See Harris, 941 F.2d at 1505 ("Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment.").

      *c.*    ***Back***

As to Plaintiff's allegation that Figueroa refused to follow specialist's recommendations that Plaintiff see a neurosurgeon for his back injury, he relies on Dr. Gama's September 23, 2013, evaluation noting Plaintiff had

severe back pain and recommending Plaintiff receive a "neurosurgical consult." Doc. 47-1 at 11. But Gama made that recommendation when Plaintiff was housed at Northwest Florida Reception Center, which was five years before Plaintiff's transfer to Suwannee C.I. And when doctors at NFRC allegedly failed to send Plaintiff to a neurosurgeon for the back consult, Plaintiff filed the § 1983 action in <u>Derks</u>, No. 5:15-cv-51-MW-GRJ.[11]

But of more import, while Plaintiff states in his Declaration that he advised Figueroa about Gama's 2013 recommendation during Figueroa's February 11, 2019, exam, Figueroa's notes from that exam show Plaintiff only complained of "joint pain" and "muscle tenderness." Doc. 44-1 at 37. Notably, other than his own statement, Plaintiff does not point to any record evidence showing Figueroa knew about Gama's 2013 recommendation for a neurological consult.

But the record does show that when Plaintiff complained to Figueroa about back pain, Figueroa recorded those complaints and treated Plaintiff accordingly. Indeed, upon his transfer to Suwannee C.I., Figueroa regularly

---

[11] The Court may take judicial notice of public records filed on another court. <u>Navarro v. City of Riviera Beach</u>, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) ("Courts may take judicial notice of public records, such as a pleading filed in another court, because such documents are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"). Notably, "judicial notice may be taken only to establish what those documents contain, not the veracity of their contents." <u>Id.</u> (citing <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271,1278 (11th Cir. 1999)).

prescribed "muscle rub," Ibuprofen, or Mobic. Plaintiff submitted his first sick-call request specifically about back pain in November 2019, almost a year after his transfer, in which he complained that he had been suffering from back pain since 2012 "but sometimes [the pain] is better [and] sometimes [it is] worse." Doc. 44-1 at 64. Upon receipt of the complaint, nurse S. Hancock examined Plaintiff, provided him with more Ibuprofen and recommended a change in Plaintiff's pain medication. Figueroa responded that Plaintiff's chronic back pain is addressed every six months, and Plaintiff knew the medical passes and medications available to him. Figueroa then prescribed Naproxen as another option for pain medication accessible to Plaintiff. Id. at 60. Figueroa again documented Plaintiff's complaint of "chronic back pain" during his February 2020 exam and renewed all medication. Id. at 35.

The sick-call requests Plaintiff submitted after February 2020 contained no complaints about back pain, but instead asked for diet passes and medical care for gastrointestinal issues. In July 2020, after Plaintiff filed this case, he again complained of back issues and Figueroa immediately renewed his pain medication and ordered a back x-ray. Id. at 34. Although the back x-ray revealed spondylytic disease and spinal stenosis, id. at 54, Figueroa did not find it medically necessary to recommend an orthopedic consult and told Plaintiff to start an exercise routine, id. at 25.

On this record, none of Figueroa's responses to Plaintiff's back injury amounted to deliberate indifference. Plaintiff has failed to demonstrate that Figueroa had subjective knowledge of Gama's 2013 recommendation for a neurological consult. But even if Figueroa did have knowledge, viewing the evidence and making all reasonable inferences in favor of Plaintiff, at most, the evidence shows a difference of opinion between a medical professional who recommended a neurological consult in 2013 and Figueroa who found it unnecessary to recommend a specialist consult in 2020. This difference of opinion cannot support an Eighth Amendment deliberate indifference claim. Likewise, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams, 61 F.3d at 1545.

Further, while Figueroa's decision to order an x-ray of Plaintiff's back may have been delayed, Plaintiff has presented no "verifying medical evidence" showing that he suffered any "detrimental effect" as result of the alleged delay. See Hill, 40 F.3d at 1188, overruled on other grounds by Hope, 536 U.S. at 730 ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.").

Thus, Figueroa did not act deliberately indifferent when treating Plaintiff's back injury.

### d.   Left Elbow

Finally, as to Plaintiff's allegation that Figueroa failed to order an x-ray of Plaintiff's left elbow, he relies on his September 6, 2019, sick-call request stating Figueroa examined him two weeks prior and told Plaintiff he "would be given x-ray[] for left elbow believed to be fractured . . . ." See Doc. 47 at 3 (citing Doc. 44-1 at 68). But during Figueroa's August 19, 2019, exam, when Figueroa noted Plaintiff's left elbow was yellowish and bruised, Figueroa only ordered x-rays of Plaintiff's left shoulder and chest. Doc. 44-1 at 36. There is no evidence that Figueroa ever ordered an x-ray for Plaintiff's left elbow, nor is there evidence that Plaintiff had a valid medical need for a left-elbow x-ray. Thus, Plaintiff has not shown an Eighth Amendment violation.

### e.   Conclusion

Upon review of the parties' filings and consideration of the evidence submitted, the Court finds that, viewing the evidence in the light most favorable to Plaintiff, Figueroa is entitled to summary judgment in his favor. The medical records show that Plaintiff received consistent and adequate medical evaluations and treatments. His complaints about specific alleged inadequacies do not amount to constitutional violations by themselves. Plaintiff was not only being treated by Figueroa. Rather, the records show that

Plaintiff received medical care and treatment from several providers at the prison.

The Constitution does not require that Plaintiff be afforded the exact medical care and treatment he requests. He is only entitled to "minimally adequate medical care." Harris, 941 F.2d at 1504 (citation omitted). And although he "may personally believe that he should have been treated differently, his personal disagreement with the treatment administered by [Figueroa] is 'a classic example of a matter for medical judgment'—not a constitutional violation." Rutledge v. Alabama, 724 F. App'x 731, 736 (11th Cir. 2018) (quoting Adams, 61 F.3d at 1545). Figueroa's Motion for Summary Judgment (Doc. 44) is due to be granted.

## VIII. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

A temporary restraining order (TRO) or preliminary injunction is appropriate where the movant shows that:

> (a) there is a substantial likelihood of success on the merits;
>
> (b) the TRO or preliminary injunction is necessary to prevent irreparable injury[12];

---

[12] The Eleventh Circuit has "emphasized on many occasions, the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" Siegel v. LePore, 234 F.3d 1163, 1176-77 (11th Cir. 2000) (per curiam) (quoting Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)).]

(c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and

(d) the TRO or preliminary injunction would not be a[d]verse to the public interest.

Parker v. State Bd. of Pardons & Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001) (per curiam) (citation and footnote omitted); see Keister v. Bell, 879 F.3d 1282, 1287-88 (11th Cir. 2018). Such injunctive relief "is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries [his] burden of persuasion on each of these prerequisites." GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers, 788 F.3d 1318, 1322 (11th Cir. 2015) (quotations and citation omitted).

Plaintiff seeks a temporary restraining order ostensibly to prevent further damage to his right shoulder and back. Doc. 60; see also Doc. 59. Mainly, he asserts that he has not yet been assigned an impaired assistant even though Figueroa issued a medical pass for assistant, and he seeks an injunction requiring Figueroa to provide the assistant. Doc. 59-3 at 1-3. But Plaintiff does not allege facts or point to evidence showing Figueroa assigns the assistant. Notably, in response to a July 2020 grievance in which Plaintiff asserted he had an impaired assistant medical pass but had no assistant, officials advised him that an assistant will be assigned "when the Annex Medical Impaired Nurse has completed training of the new assistants." Doc. 7-

1 at 21-22. Considering that evidence and for the reasons articulated above in granting summary judgment for Figueroa, Plaintiff's request is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.     Defendant Dr. Figueroa's Di[s]positive Motion for Summary Judgment (Doc. 44) is **GRANTED**.

2.     Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 59) is **DENIED**.

3.     The Clerk is **DIRECTED** to enter judgment for Defendant Figueroa and against Plaintiff and **CLOSE** the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of June, 2022.

_____
BRIAN J. DAVIS
United States District Judge

Jax-7

C:     Larkin Derks, #849475
       counsel of record

40